IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

      Plaintiff-Respondent,

  vs.                             CIVIL NO. 05-772 WJ/LFG
                                       CRIM. NO. 04-235 WJ

RAUL MONSIVAIS-VARGAS,

      Defendant-Movant.


**MAGISTRATE JUDGE'S FINDINGS
AND RECOMMENDED DISPOSITION**[1]

**Findings**

1.  This is a proceeding on a Motion to Vacate, Set Aside or Correct Sentence pursuant to

28 U.S.C. § 2255.  Movant Raul Monsivais-Vargas ("Vargas") attacks the conviction and sentence

entered by the United States District Court for the District of New Mexico in United States v.

Monsivais-Vargas, No. CR 04-235 WJ.  The Government filed its Response [Doc. 7] on September

7, 2005, seeking dismissal of the case.  For the reasons given below, the Court recommends that the

Motion to Vacate be denied and the case be dismissed with prejudice.

Factual and Procedural Background

2.  On the morning of February 3, 2004, a confidential informant (hereafter identified as the

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party
may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party
must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party
wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate
review will be allowed.

"CI") told Special Agents Timothy R. Davis and Joe Mata that he or she (neither the gender nor identity of the CI is revealed on the record) had knowledge that Vargas had a "significant quantity of cocaine" cached at his apartment in Albuquerque. In a Report of Investigation [Doc. 7, Ex. 1] and in an Affidavit in Support of Application for Search Warrant [Doc. 7, Ex. 2], Agent Davis stated that this CI had a history of reliability and truthful information in several other federal investigations involving seizure of contraband as a direct result of his/her information, and that the CI was cooperating with this investigation for potential sentencing consideration for a relative facing a federal sentence. Thus, the affidavit in support of the search warrant demonstrated that the informant had, in the past, proved to be reliable. However, that is not enough. The information presented by the informant must also be reliable. It isn't enough for the CI to assert that Vargas has drugs. The CI must demonstrate how he/she knows of the presence of drugs. Here, the CI provided direct evidence of how and why he/she knew of the drugs.

3. The CI told Agents Davis and Mata that s/he entered Vargas's apartment the preceding night at around 11:00 p.m., without permission, and observed cocaine hidden in a suitcase in the closet of Vargas's bedroom. In the Report and Affidavit, Davis stated that the CI did not go into the apartment at the direction of government agents, but rather went in of his/her own accord and told the Agents about the cocaine only after s/he observed it. [Doc. 7, Ex. 1 at 3-4; Ex. 2 at 7-8]. At around 11:15 a.m. on February 3, 2004, the CI accompanied agents to Vargas's apartment and identified his dwelling. The CI also drew a diagram of the interior of the apartment. [Doc. 7, Ex. 1 at 4; Ex. 2 at 8].

4. On the strength of this information, the DEA agents obtained a search warrant from a United States Magistrate Judge at around 1:25 p.m. that day. When they executed the warrant at

around 2:00 p.m., they found Vargas inside the apartment. Agents seized a quantity of cocaine weighing more than 500 grams from a file box in the closet in Vargas's bedroom, the place where the CI had observed them. The cocaine had been packaged for distribution in several plastic baggies. Agents also seized a digital scale which was in the file box along with the cocaine. The quantity of cocaine seized, the scales to weigh it, and packaging materials seized are all consistent with trafficking. Several documents were also seized from the bedroom which, Agent Davis said, indicated that the bedroom was under the dominion and control of Vargas. The Report stated further that Vargas was the sole inhabitant of the bedroom and apartment. Vargas was arrested and transported to the DEA office. [Doc. 7, Ex. 1 at 4]. The drugs were found in the location, in the closet, in the bedroom identified by the CI.

5. Several DEA agents interviewed Vargas following his arrest. Davis stated in his Report that the agents determined that Vargas spoke and understood English. The agents offered to conduct the interview in Spanish, but Vargas told them that English would be fine. Special Agent David Tyree advised Vargas of his Miranda rights in both Spanish and English. Vargas stated he understood his rights and nonetheless agreed to speak with the agents. [Doc. 7, Ex. 1 at 5].

6. Vargas told the agents that he was born in Mexico and had been educated to the ninth grade level in Phoenix, Arizona. Vargas admitted to the agents that the cocaine found in his apartment belonged to him. He stated that he did not sell it, but that it was given to him by an individual whom Vargas would not identify for fear of retaliation. He said that the cocaine had been in his apartment for the preceding three days. Based on this confession, Tyree presented Vargas with a statement written down by Tyree. Vargas signed the statement in the presence of witnesses. The statement read, "The cocaine found in the closet of my room today, 2-3-2004, by the DEA, was

3

mine."   While being transported to his initial appearance the next day, Vargas told Tyree that there

had been a suitcase stored in his closet until the morning of February 3, 2004.  [Doc. 7, Ex. 1 at 5-6].

7.  At a detention hearing on February 5, 2004, Vargas stipulated to detention.  He was

ordered held pending trial, and Tom Jameson, a skilled and knowledgeable criminal defense attorney

with the Federal Public Defender, was appointed to represent him.  [Docs. 5-7 in CR 04-235].

8.  On February 10, 2004, the grand jury handed down an Indictment charging Vargas with

possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§

841(a)(1) and 841(b)(1)(B) [Doc. 9 in CR 04-235].  The statutory sentencing range for conviction

under § 841(b)(1)(B) is 5 to 40 years imprisonment plus a fine of up to $2 million.

9.  On March 30, 2004, after plea negotiations, the United States Attorney filed a Superseding

Information charging Vargas with possession with intent to distribute a quantity of a mixture and

substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(C).  [Doc. 15 in CR 04-235].  Unlike § 841(b)(1)(B), there is no statutory minimum for

conviction under § 841(b)(1)(C).  The statutory maximum is 20 years imprisonment and a fine of up

to $1 million.  Thus, the Superseding Information resulted in a reduction in the charge against Vargas

and a lower potential sentence.  The potential prison exposure was cut in half and the mandatory

minimum sentence was eliminated.  So, too, the financial exposure in terms of fines was reduced from

$2 million to $1 million, and the reduced charge carried a lesser period of supervised release.  This

reduction in the charge was contemporaneous with Vargas's agreement to plead guilty; the change

of plea hearing was scheduled for March 30, 2004.  [Doc. 16 in CR 04-235].

10.  On March 30, 2004, Vargas signed a waiver of his right to enter a plea before a United

States District Judge and consented to appear before a Magistrate Judge.  He also signed a Waiver

of Indictment on that date.  [Docs. 16, 17 in CR 04-235].

11.  In his Plea Agreement, also dated March 30, 2004, Vargas stated that he understood and agreed to waive his rights to plead not guilty, to proceed to trial by jury, to confront and cross-examine witnesses and call witnesses in his defense, and his right against compelled self-incrimination. The maximum penalty of 20 years and a fine of $1 million was set forth in the Agreement, as well as the terms of supervised release, special penalty assessment, and possible restitution.  This was not a Fed. R. Crim. P. 11(c)(1)(C) plea, and Vargas stated in the Plea Agreement that he fully understood that determination of the sentence to be imposed would rest solely in the discretion of the court.  The Government, for its part, agreed to dismiss the Indictment and recommend that the court sentence Vargas at the low end of the applicable guideline range.  [Doc. 18 in CR 04-235].  The applicable guideline range was ultimately determined to be 51-63 months.  At sentencing, United States District Judge William Johnson imposed a sentence on Vargas of 51 months, the lowest possible end of the applicable range.  [Docs. 21, 22 in CR 04-235].  Thus, the government fully lived up to its bargain in the Plea Agreement.

12.  Vargas also signed a statement in his Plea Agreement that his plea of guilty was "freely and voluntarily made and not the result of force or threats or of promises apart from those set forth in this plea agreement."  In addition, he waived his right to appeal the sentence, except in the case of an upward departure.  [Doc. 18 in CR 04-235].

13.  A plea hearing was held on March 30, 2004 in front of United State Magistrate Judge Robert H. Scott.  A certified Spanish-language interpreter was present for the hearing and provided simultaneous interpretive services to Defendant.  [Doc. 19 in CR 04-235].  Judge Scott conducted the felony plea hearing in accord with the requirements of Fed. R. Civ. P. 11 and followed the plea

5

colloquy contained in the District Court Judge's Benchbook, Magistrate Judge Scott had the clerk administer the oath to Vargas.  Vargas was sworn in and testified under oath that he was not under the influence of any medicine, drugs or alcohol.  Under careful and thorough questioning by Judge Scott, Vargas stated that he discussed the charge against him with his attorney and was satisfied with his attorney's representation.  He confirmed that he had been advised of his right to proceed before an Article III judge, but instead chose to sign the consent to appear before a Magistrate Judge, and a waiver of indictment, after the documents were read to him in Spanish.  [Transcript of March 30, 2004 Plea Hearing, at 2-4; hereafter referred to the format, "PH 2-4"].

14.  Judge Scott asked Vargas whether the Plea Agreement had been read to him in Spanish, and whether he'd had time to review it with his attorney before signing it.  Vargas stated that he had. Vargas was asked by the judge if he understood the Plea Agreement, and he testified that he understood the terms of the agreement, that no one coerced him into signing it, and that no promises were made to him other than those appearing in the agreement.  He stated further that he was voluntarily pleading guilty because he was, in fact, guilty of the crime charged.  [PH 4-5].  Vargas was under oath at the time he made these statements.

15.  Judge Scott explained to Vargas that the maximum penalty he might receive was imprisonment for a term of up to 20 years, a fine of up to $1 million, a mandatory term of supervised release of at least three years, and a special penalty assessment of $100, plus any restitution ordered by the court.  Vargas said he understood these possible penalties.  He stated further that he understood that the trial judge would not be able to determine his sentence until after the presentence report had been completed and both sides had the opportunity to challenge the facts as set forth in the presentence report, as well as application of the guidelines recommended by the United States

Probation Office.  [PH 5-6].

16.  Vargas also testified that he was aware he was waiving his right to appeal, and that he had discussed this matter with his attorney and understood the right that he was giving up.  Vargas further agreed to the factual basis of the plea, as set forth by the Assistant United States Attorney, stating, "They [the facts] are correct.  It is all correct."  [PH 8].  The AUSA's factual statement, to which Vargas agreed, included the information that the cocaine found in Vargas's closet had a net weight of 681.5 grams and was packaged in small bags consistent with distribution. Vargas also agreed that, following his arrest, he admitted to agents that the cocaine was his.  [PH 6-8].  Following the plea colloquy, Vargas pled guilty, and the Court adjudged him guilty of the offense.  [PH 8-9].

17.  Judgment was entered on June 24, 2004.  [Doc. 21 in CR 04-235].  As noted above, Vargas received a sentence of 51 months, or four years and 3 months.  On July 15, 2005, he filed this Motion under 28 U.S.C. § 2255.  [Doc. 1].  Although the Motion was filed after the one-year limitation period of § 2255, Vargas states in his affidavit that he submitted the Motion to prison officials to be mailed to the Court on June 18, 2005.  The Motion is therefore timely.

## Discussion

18.  Vargas's first ground for seeking habeas relief is his assertion that his plea was not voluntary, because no one explained to him the nature of the charge or the consequences of his plea. He also alleges that his plea was involuntary as he had ineffective assistance of counsel, in that his attorney failed to investigate, interview witnesses or marshal any sort of defense.

19.  These claims are flatly contradicted by the record.  The record does not support any claim that Defendant was having language difficulty in understanding the charge, the plea, or the consequences of a conviction.  Although born in Mexico, Vargas received an education to the ninth

grade level in Arizona schools, and he told the agents at the time of his arrest that he spoke and understood English. At his arrest, law enforcement agents read Vargas his Miranda rights in both English and Spanish and offered to conduct the interview in Spanish, but Vargas declined. He acknowledged at the plea hearing that all pertinent documents, including the Plea Agreement, were read to him in Spanish. In addition, a Spanish-language interpreter was present at the plea hearing.

20. Magistrate Judge Scott explained to Vargas, at the plea hearing, the crime with which he was charged and the maximum penalty that could be imposed. In addition to Magistrate Judge Scott's thorough explanation of the charge, Defendant acknowledged receipt of the Superseding Information; in addition, the Plea Agreement, which Defendant read and understood, contains a description of the offense. Judge Scott ascertained that Vargas was not under the influence of any medications, drugs or alcohol at the time of the hearing. He obtained Vargas's assurances that he had read the Plea Agreement, reviewed it with his attorney, and understood the agreement. Vargas stated under oath that he was satisfied with the services rendered by his attorney, that he understood the terms of the agreement and understood the possible penalties, that no one coerced him into signing the agreement, and that he was voluntarily pleading guilty because he was guilty of the crime as charged. Vargas also acknowledged that he was aware he had the right to appeal but voluntarily waived it as part of the Plea Agreement.

21. There is absolutely nothing on the record to support Vargas's assertion that he did not understand the nature of the charge against him or the penalties he would face if he pled guilty. He was under oath at the time he was questioned by Judge Scott and stated unequivocally that he was guilty of the crime as charged, that he understood the nature of the charge and the penalty, and that he was voluntarily pleading guilty.

22.   Performance by defense counsel that is constitutionally inadequate can render a plea involuntary.  Romero v. Tansy, 46 F.3d 1024, 1033 (10th Cir. 1995).  However, in this case, there is nothing on the record to show that Vargas's attorney gave him poor advice in counseling acceptance of the plea, or that the attorney failed to conduct a proper investigation of the case.

23.   To the contrary, Defendant was represented by a highly skilled and competent criminal defense attorney who negotiated an extremely beneficial plea on defendant's behalf.  The facts of the case are not complicated:  A confidential informant, who had provided reliable information to law enforcement in the past, provided information which was accurate.  The informant had been in a position to see and personally observed a large quantity of cocaine in a suitcase hidden in Defendant's closet, within Defendant's bedroom.  Upon execution of a search warrant obtained on the basis of the informant's information, Vargas was found in his apartment with a quantity of cocaine, packaging material and scales, all used for drug distribution.

24.   After being advised of his rights, Vargas made inculpatory statements, admitting that the cocaine was his.  He was charged in an indictment with one count of possession with intent to distribute, later reduced to a lesser charge by Superseding Information, which apparently came about as a result of plea negotiations.  The original charge, supported by the evidence, would have exposed Vargas to a substantially longer sentence.  Vargas obtained a substantial benefit from his plea, in that he was allowed to plead to a lesser charge than that originally brought by the grand jury, and his potential sentence was further reduced by acceptance of responsibility.  There is nothing on the record to indicate that Vargas was poorly counseled with respect to the plea bargain.  Rather, the record supports the opposite conclusion, that defense counsel's accurate evaluation of the evidence and of Vargas's situation demonstrated the significant likelihood that Vargas would be convicted of the

original and more serious charge.

25.  Vargas was given the opportunity at the plea hearing to tell the judge that his attorney

failed to adequately represent him, by failing "to investigate or to interview any possible witnesses

or to marshal a defense" [Doc. 1, at 5], if Vargas honestly thought that to be the case.  He gives no

explanation for his nearly one-year delay in bringing these charges against his attorney.  He would

have been aware of these alleged deficiencies in his counsel's representation at the time of the plea

hearing.  In Blackledge v. Allison, 431 U.S. 63, 73-74, 97 S. Ct. 1621, 1629 (1977), the United

States Supreme Court:

> pronounced the general rule where a habeas petitioner seeks relief
> based on claims that are contradicted by the record:  "For the
> representations of the defendant, his lawyer, and the prosecutor at
> such a hearing, as well as any findings made by the judge in accepting
> the plea, constitute a formidable barrier in any subsequent collateral
> proceedings.  Solemn declarations in open court carry a strong
> presumption of verity.  The subsequent presentation of conclusory
> allegations unsupported by specifics is subject to summary dismissal,
> as are contentions that in the face of the record are wholly incredible."

Lasiter v. Thomas, 89 F.3d 699, 702 (10th Cir. 1996).

26.  The Court rejects, as wholly unsupported by the record, Vargas's assertion that he did

not understand the nature of the charge nor the consequences of his plea, and the Court further rejects

his claims that his attorney's alleged "incompetence" somehow led him to enter the plea involuntarily.

27.  Most of the remaining allegations of Vargas's § 2255 Motion concern events occurring

prior to entry of his guilty plea.  He complains of illegal search and seizure in that the search warrant

was obtained by means of a false affidavit; complains that his attorney was ineffective in failing to

have the evidence suppressed; complains that the CI acted as a government agent and took part in

the investigation; and complains that the prosecution failed to disclose evidence favorable to his

defense.

28.  A defendant who voluntarily and intelligently pleads guilty waives all non-jurisdictional

defenses, and "[h]aving pleaded guilty, a defendant's only avenue for challenging his conviction is to

claim that he did not voluntarily or intelligently enter his plea." United States v. Wright, 43 F.3d 491,

494 (10th Cir. 1994).  Thus, the movant is barred from raising claims other than those that go to the

knowing and voluntary nature of his plea.  Wright, at 494.

> [A] guilty plea represents a break in the chain of events which has
> preceded it in the criminal process.  When a criminal defendant has
> solemnly admitted in open court that he is in fact guilty of the offense
> with which he is charged, he may not thereafter raise independent
> claims relating to the deprivation of constitutional rights that occurred
> prior to the entry of the guilty plea.

United States v. Davis, 900 F.2d 1524, 1526 (10th Cir. 1990), *quoting from* Tollett v. Henderson,

411 U.S. 258, 267, 93 S. Ct. 1602, 1608 (1973).

29.  The Court, having found that Vargas's plea was knowingly and voluntarily entered, will

not consider Vargas's claims that the investigating agents falsified the search warrant affidavit or that

the CI acted at the direction of the agents.[2]  Rather than pursue these contentions, Vargas elected to

accept the prosecution's offer of a plea agreement.  However, to the extent Vargas argues that his

counsel was ineffective in failing to seek suppression of evidence he claims was illegally obtained, the

---

[2]Vargas also hints at a claim that the CI planted the cocaine in his apartment.  He does not state this explicitly, but rather alleges that the CI "participated in giving agents the quantity of cocaine that allegedly [sic] being cached by Raul Vargas"; and that the CI "involved himself in quantity of cocaine, not proved to a jury beyond a reasonable doubt." [Doc. 1, at 5-6].  If Vargas means to assert that the CI put the cocaine in his apartment without his knowledge, he has not done so in a manner which the Court can review.  In any event, Vargas admitted to the arresting officers that the cocaine was his, and he does not claim that this confession was coerced in any way.  The course of his behavior from arrest to sentencing as it appears on the record is entirely inconsistent with the allegation, if that is what he intended to allege, that he did not know about the cocaine and that all or even a portion of it was placed in his closet without his knowledge.  Moreover, after listening to the government's proof as to the facts it would present through competent, admissible evidence and beyond a reasonable doubt, Vargas agreed that the prosecutor's proffer was correct.  Vargas stated under oath "they [the facts] are correct.  It is all correct."  [PH 8].

Court will consider the search and seizure and affidavit falsification claims not directly on their own merits, but under the standard of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which requires that the Court to apply a "highly deferential" scrutiny  in reviewing counsel's effectiveness. Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995).

30.   In addition, Vargas's guilty plea does not bar consideration of his claim that the prosecution withheld exculpatory information, as a claim under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), alleges behavior on the part of the prosecution which can in certain circumstances render a guilty plea involuntary.  Wright, at 495-96.

31.   As noted above, Vargas argues that his counsel was ineffective in failing to move for suppression of the cocaine evidence.  He appears to posit, as grounds for suppression, the claim that the CI was acting as a government agent at the time s/he entered Vargas's apartment and discovered the cocaine, and that the agents falsified the search warrant affidavit by claiming that the CI acted on his/her own.

32.   To establish ineffective assistance of counsel, Vargas must make a two-pronged showing:  (1) that his attorney's performance was constitutionally defective; and (2) that the deficient performance prejudiced his defense in that counsel's errors were so serious as to deprive him of a fair trial with a reliable result. Strickland v. Washington, 466 U.S. at 687.  To prove deficient performance, Vargas must overcome the presumption that counsel's conduct was constitutionally effective, Duvall v. Reynolds, 139 F.3d 768, 777 (10th Cir. 1998), and as noted above, scrutiny of counsel's performance must be "highly deferential" and must avoid the distorting effects of hindsight. Miles v. Dorsey, *supra*, at 1474.  In order to be found constitutionally ineffective, counsel's performance must be shown to have fallen below an objective standard of reasonableness. Strickland,

466 U.S. at 687-88.  In addition, the burden is on Vargas to show there is a reasonable probability

that, but for counsel's ineffective assistance, the result of the proceeding would have been different.

Id., at 694.  In a situation where the defendant pled guilty, his burden is to show that:

> counsel's constitutionally ineffective performance affected the outcome of the plea process.  In other words, in order the satisfy the "prejudice" requirement [of Strickland v. Washington], the defendant must show that there is a  reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985).

33.  In this case, Vargas argues that his attorney was ineffective in not filing a motion to

suppress the cocaine evidence seized from his apartment, when the search warrant was issued on the

basis of a tip from a private individual who entered the apartment without Vargas's permission.  The

Fourth Amendment protects citizens from unreasonable searches and seizures by government actors.

U.S. Const. amend. IV; Burdeau v. McDowell, 256 U.S. 465, 475, 41 S. Ct. 574, 576 (1921).  The

Supreme Court has "consistently construed this protection as proscribing only governmental action;

it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private

individual not acting as an agent of the Government or with the participation or knowledge of any

governmental official."  [Internal punctuation omitted].  United States v. Jacobsen, 466 U.S. 109,

113, 104 S. Ct. 1652, 1656 (1984).

> However, in some cases a search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment if the government coerces, dominates or directs the actions of a private person conducting the search or seizure . . . .  In such a case, the private citizen may be regarded as an agent or instrumentality of the police and the fruits of the search may be suppressed.  [Internal punctuation omitted].

United States v. Smythe, 84 F.3d 1240, 1242 (10th Cir. 1996).

34.   A two-part test is to be applied in determining when a search by a private person "becomes" government action:  (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performed the search with the intention of assisting law enforcement efforts instead of merely furthering his or her own ends.  Both prongs of this test must be met before private action becomes government action for purposes of the Fourth Amendment analysis.  United States v. Leffall, 82 F.3d 343, 347 (10th Cir. 1996).

35.   In Leffall, the Tenth Circuit examined a number of cases in which courts held that even if police or government agents were present at the time and place that the search occurred, that circumstance would not necessarily transform a private search into government action.  The constitutional issue would arise only if, for instance, the officers encouraged the search, actively aided the private party to conduct the search (*see, e.g.*, United States v. Souza, 223 F.3d 1197 (10th Cir. 2000), or were called in for protection or to serve as "lookouts" in order to assist a private actor in illegally invading the defendant's private property.  In addition, "a mere purpose to assist the government will not be sufficient in and of itself to transform and otherwise private search into a government search," nor will the private person's prior interaction with law enforcement, standing alone, compel the conclusion that the government directed or acquiesced in the conduct.  Leffall, *supra* at 349 [internal punctuation omitted]; United States v. Humphrey, 208 F.3d 1190, 1203 (10th Cir. 2000).

36.   There is nothing on the record to indicate that the special agents in this case were aware of the CI's entry into Vargas's apartment before it happened, nor that they encouraged it or acquiesced in it, nor that they were present or participated in the entry at the time it occurred.

14

Indeed, the evidence is to the contrary. Agent Davis's affidavit in support of the warrant specifically states that the CI did not go into the apartment at the direction of the government, but rather on his own accord. [Doc. 7, Ex. 1].

37. Vargas has not presented any support for his bald assertion that the CI was a surrogate for the agents and acted at their direction, and that Agent Davis lied in his affidavit when he stated the agents learned about the CI's intrusion into Vargas's apartment only after the fact. Vargas does not otherwise explain away his confession, his admission concerning the government's proffer at the plea hearing, nor his own admission that he was entering his plea freely and voluntarily because he was guilty.

38. As noted above, the Tenth Circuit does not consider definitive the fact that the private actor had a prior relationship with the police as an informant, nor that the actor may have had a primary motive to assist law enforcement efforts. The seizure itself was done by agents under a search warrant authorized by a federal Magistrate Judge, who had an opportunity to judge the truthfulness of the affidavit. Vargas has presented the Court with nothing, aside from his own wild speculation, to satisfy the first prong of the test set forth in Leffall. Under these circumstances, the Court specifically rejects Vargas's unsupported assertion that his attorney was ineffective in electing not to file a motion to suppress. Indeed, attorney Tom Jameson's ability to negotiate a favorable plea when the evidence would have supported a conviction on the original, more serious charge, is a credit to defense counsel's considerable abilities.

39. Vargas also claims that the prosecution failed to disclose evidence favorable to the defense, including "background, arrest report, rap sheet, and name of confidential source or to release what case or other defendants confidential informant was related." [Doc. 1, at 6]. He also asserts

that the government "failed to prove that the confidential informant was truthful or reliable."

40. There is no indication on the record that the government failed to disclose to Vargas his prior arrest record. A discovery order was entered in this case on February 19, 2004, directing that the government furnish Vargas with a copy of his prior criminal record. [Doc. 12 in CR 04-235, at 2]. In addition, Vargas was informed by the Magistrate Judge at the plea hearing that a presentence report, which includes information on prior arrests and convictions, would be prepared, and that Vargas would have the opportunity to file objections or corrections to the presentence report in the event there were any errors. [PH 9]. Vargas's criminal record, used to calculate his criminal history under the federal sentencing guidelines, was in Vargas's possession prior to the dispositional hearing. Yet, Vargas never asserted any error in that record. In any event, Vargas fails to explain in what way the rap sheet and/or arrest record would have been exculpatory.

41. Vargas also faults the prosecution for not disclosing the identity of the CI, and he implicitly faults his attorney for not moving to compel this disclosure. The Government normally retains the privilege to withhold from disclosure the identity of persons who furnish information of violations of the law to police officers. Roviaro v. United States, 353 U.S. 53, 77 S. Ct. 623 (1957). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement . . . [and] maintain[ing] the Government's channels of communication by shielding the identity of an informer from those who would have cause to resent his conduct." Id., 353 U.S. at 59, 60 n.8.

42. This privilege will not be upheld, however, if disclosure of an informer's identity is essential to a fair determination of the case, for example where the informer "helped to set up the criminal occurrence and had played a prominent part in it," or where the informer "was the sole

participant, other than the accused, in the transaction charged," as was the case in <u>Roviaro</u>, or in situations where the legality of a warrantless search is at issue and the communications of an informer are claimed to establish probable cause.  <u>Roviaro</u>, 353 U.S. at 61.

43.  Unlike Roviaro, in this case Vargas confessed to the crime and pled guilty, stating under oath that he was pleading guilty because he was guilty, and that he committed the crime charged – that is, possession of cocaine with intent to distribute.  Defendant in <u>Roviaro</u> denied guilt and went to trial, and the Court found that his inability to cross examine the informer made it impossible for him to get a fair trial.  Vargas does not explain how disclosure of the identity of CI, under the circumstances of his case, would have improved the fairness of the proceedings.  It is certainly not error to fail to pursue a futile act, and none of the criteria that would warrant disclosure of the CI are present here.

44.  In addition, as the Court in <u>Roviaro</u> noted, federal courts often hold the confidential informer privilege inapplicable in situations where evidence is seized without a warrant and solely on the basis of communications made by an informant.  Again, that is not the situation in Vargas's case, as the agents obtained a search warrant from a federal Magistrate Judge.

> The Fourth Amendment is served if a judicial mind passes upon the existence of probable cause.  Where the issue is submitted upon an application for a warrant, the magistrate is trusted to evaluate the credibility of the affiant in an ex parte proceeding.  As we have said, the magistrate is concerned, not with whether the informant lied, but with whether the affiant is truthful in his recitation of what he was told.  If the magistrate doubts the credibility of the affiant, he may require that the informant be identified or even produced.  [Internal punctuation omitted].

<u>McCray v. Illinois</u>, 386 U.S. 300, 307-08, 87 S. Ct. 1056, 1060-61 (1967).

45.  While it is "error of constitutional dimension" for a court to deny disclosure of an

informant's identity solely because of potential danger to the informant, when knowledge of the identity is essential to a fair determination of the case, nevertheless, "mere speculation about the usefulness of an informant's testimony is not sufficient." United States v. Scafe, 822 F.2d 928, 933 (10th Cir. 1987).  When the CI was not a participant in the transaction in question, disclosure is not required.  Id.; United States v. Mendoza-Salgado, 964 F.2d 993, 1001 (10th Cir. 1992).

    46.  In the present case, the CI was not a participant in the crime charged, and Vargas has not presented any evidence, or even argument, that would convince the Court that disclosure of the CI's identity would have aided in his defense.  Under these circumstances, neither the Government nor Vargas's attorney committed misconduct or malfeasance in failing to ensure that the CI's identity was revealed.

### Recommended Disposition

That the Motion to Vacate Sentence Under 28 U.S.C. § 2255 be denied and the case be dismissed with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge

18